IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CENTRAL UTAH CLINIC, a Utah professional corporation,<br><br>                         Plaintiff,<br><br><br><br>                vs.<br><br><br>MARK W. REILLY, M.D.,<br><br>                                Defendant.<br>_____<br><br>MARK W. REILLY, M.D.<br><br>                        Counter Plaintiff,<br><br>                vs.<br><br>CENTRAL UTAH CLINIC, a Utah professional corporation,<br><br>                        Counter Defendant. | ORDER and MEMORANDUM DECISION<br><br><br><br><br><br>Case No. 2:07-CV-284 CW |

Plaintiff Central Utah Clinic brings this action against Dr. Mark W. Reilly to collect debts that it alleges Dr. Reilly incurred while associated with the Clinic. Dr. Reilly disputes that he is responsible for those debts and has counterclaimed for, among other things, payments he believes the Clinic should have made to him when he left the Clinic in 2005. Now before the court are the parties' cross motions for partial summary judgment. For the reasons discussed below, the court GRANTS in part and DENIES in part both parties' motions.

## BACKGROUND

Dr. Reilly was a radiation oncologist who was associated with the Clinic from 2000 to 2005.  He signed two written employment agreements with the Clinic, one in 2000 and one in 2001.  Only the 2001 agreement remains at issue.  The Clinic is a professional corporation in which Dr. Reilly purchased shares.  The Clinic is a separate legal entity from its individual shareholders and employees.  Dr. Reilly and an associate of his, Dr. Tarlton Blair, were the first radiation oncologists to join the Clinic.  When they joined in December 2000, the Clinic formed the Radiation Oncology department.  In 2001, the Clinic hired Dr. Jay Clark to work in that department as well.  In December 2003, the Clinic opened an on-site radiation oncology center and purchased or leased expensive equipment to be used at that center.  Dr. Reilly, Dr. Blair and Dr. Clark entered an agreement with the Clinic giving them the option, but not the requirement, to purchase Clinic's interest in the leases or the equipment in the event that all three should depart from the Clinic prior to the expiration of the lease terms.  In May 2004, the Clinic made a large payment to Medicare, which the Clinic states was a return of funds improperly billed by Dr. Reilly's department.

In 2005, Dr. Reilly decided to leave the Clinic.  Dr. Clark had previously left, but Dr. Blair remained at the Clinic.  After Dr. Reilly left, the Clinic billed him for debts for which the Clinic asserted Dr. Reilly had assumed personal liability.  The Clinic claims it is entitled to payment for three types of debt: (1) operating expenses (further divided into "professional" and "technical" expenses), (2) first year losses for Dr. Clark, and (3) the payment to Medicare.  "Professional" expenses included the costs of paying office staff and "technical" expenses related

to the equipment used by Dr. Reilly's department.  Dr. Reilly denies that he had ever agreed to be personally liable for those debts and has refused to pay.

In April 2007, the Clinic sued Dr. Reilly in Utah state court alleging claims for breach of contract and unjust enrichment, and seeking a judgment of $284,913.  Dr. Reilly removed the action to this court based on diversity (he does not currently reside in Utah) and filed a counterclaim against the Clinic, claiming breach of contract, unjust enrichment, breach of fiduciary duty, implied contract, and accounting.

The parties have filed cross motions for partial summary judgment, each seeking judgment on both factual and legal points.  As further discussed in this order, the court finds that, on the undisputed facts, Dr. Reilly did not agree to be personally liable for the expenses which the Clinic seeks to recover and that Dr. Reilly was paid under the 2001 Employment Agreement, not pursuant to a partnership or some other agreement.  In this action, the Clinic seeks to hold Dr. Reilly personally responsible for the expenses and other obligations of the Clinic in disregard of his limited liability as a shareholder and employee of the Clinic.  The evidence on this record is insufficient for a jury to find that Dr. Reilly agreed to accept personally liability for the expenses incurred by the Clinic in the operation of its business.  As set forth below, the Clinic's claims fail.  Accordingly, Dr. Reilly's motion to for judgment in his favor on the Clinic's claims against him is GRANTED.  The remaining items raised by the parties' cross motions are also discussed below.

## ANALYSIS

### I.      Summary Judgment Standards

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).  See also Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  Courts must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

If parties file cross motions for summary judgment, the court "is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  Moreover, denying one party's cross motion for summary judgment does not does not require the court to grant the other one. See Buell Cabinet v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979).

### II.      The Clinic's Claims Against Dr. Reilly

#### A.      Breach of Contract

While the Clinic states that it seeks judgment on eight discrete points, the first six points are all interrelated and are addressed together here.  The Clinic's core contention is that Dr. Reilly agreed to be personally liable for operating expenses incurred by the Clinic which it attributes to Dr. Reilly's portion of the practice, for Dr. Clark's first year losses, and for the

repayment made to Medicare.  The Clinic asserts that Dr. Reilly has breached his promise to pay for these expenses.

Dr. Reilly does not generally dispute that those expenses were incurred by the Clinic while he was associated with the Clinic.  He does claim, however, that the Clinic has not properly calculated or accounted for these expenses.  More importantly, as to the core issue presented by the cross-motions now before the court, Dr. Reilly asserts that the expenses were obligations of the Clinic for which he did not agree to be personally liable.  The court agrees with Dr. Reilly that the Clinic has not met its burden of presenting sufficient evidence from which a jury could find that Dr. Reilly agreed to accept personal responsibility for these expenses.

### 1.    The 2001 Employment Agreement

The starting point for the Clinic's argument is the 2001 Employment Agreement.  The parties do not dispute that this is a binding and enforceable contract.  They certainly contest, however, the legal significance of the 2001 Employment Agreement's language.  The Clinic argues that the 2001 Employment Agreement expressly obligated Dr. Reilly to pay for expenses out of his pocket, either by its express terms or because it represented a partnership arrangement. In support of its first contention, the Clinic points to Article II, Paragraph 2 of the 2001 Employment Agreement which states as follows:

Draws. Employee shall be entitled to take a draw against his salary in the amount of $_____ for each two week pay period.  The first draw shall be taken on the first normal payroll date following the commencement date of this Agreement and subsequent payments shall be made each second week thereafter.  The Corporation shall reconcile Employee's draws with actual salary payable to employee on a quarterly basis.  If in any

quarter the Employee's draws exceed the amount of the employee's actual salary entitlement, no further draws shall be taken by Employee until the deficit is made up.[1]

(2001 Employment Agreement at 2, attached as Ex. P. to Clinic's Memo. in Support.)

This paragraph is unambiguous and does not support the Clinic's position.  Under this provision, Dr. Reilly was allowed to take draws against his salary entitlement.  The Clinic was required each quarter to reconcile the draws against his salary entitlement.  In the event the draws exceeded the salary entitlement, no further draws were to be allowed until the deficit was "made up."  The language allows only one reasonable interpretation:  Dr. Reilly agreed to "make up" any overdraw on what amounted to advances on his salary before he could take any further draws.  A "make up" would occur by debiting the "deficit" against future "actual salary entitlements."

For example, assume that Dr. Reilly took draws totaling $50,000 dollars during a certain quarter, but at the end of that quarter, the Clinic in its reconciliation determined that he was only entitled to $45,000 of salary for that quarter.  Dr. Reilly would be required to "make up" the $5,000 "deficit" between his $50,000 draw and his "actual salary entitlement" of $45,000 before he would be allowed to take additional draws.  The "make up" would then occur when the $5,000 "deficit" was carried forward as a debit in calculating Dr. Reilly's "actual salary entitlement" for the next quarter or quarters.

---

[1]The agreement was signed with the amount of the draw left blank.  The parties do not argue that the contract fails on that ground.  Apparently, the Clinic allowed Dr. Reilly to set the amount of the draw based upon projections for the amount of income to be generated by his practice.  The Clinic acknowledged its agreement by making the draw payments as requested.

The Clinic's argument that this provision makes Dr. Reilly personally liable for the Clinic's expenses is contrary to this straight forward interpretation.  The Clinic argues that the court should interpret the term "deficit" to refer to Dr. Reilly's income minus expenses charged against the department in which he worked, apparently allocated between the doctors working in that department.  The Clinic further argues that to "make up" the "deficit," Dr. Reilly became personally liable in the event his actual salary entitlement was not sufficient.  Under this reading, if in any quarter the department expenses allocated to Dr. Reilly were greater than his salary entitlement, Dr. Reilly incurred a debt to Clinic in the amount of the "deficit."  For example, assume the Clinic determined in a certain quarter that the expenses allocated to Dr. Reilly were $5,000 dollars greater than the income allocated to him.  Following the Clinic's reading, Dr. Reilly then would become personally liable for a $5,000 debt to the Clinic.

There are at least three problems with this proposed reading.  First, in the context of the paragraph it is clear that the term "deficit" does not refer to Dr. Reilly's income minus expenses the Clinic allocates to him.  Instead, "deficit" refers exclusively to the difference between Dr. Reilly's draw in a quarter and his "actual salary entitlement" for that quarter.  The expenses incurred by the Clinic and allocated to Dr. Reilly were a factor to be used by the Clinic to calculate Dr. Reilly's actual salary, but there was no agreement that a deficit would become a personal debt.  The terms "actual salary" cannot be reasonably read to include a negative figure. See, e.g., Black's Law Dictionary (8th ed. 2004) (defining "salary" as "an agreed compensation for services . . ."). Compensation paid for services cannot meaningful be interpreted as creating a debt.  Accordingly, while it might be reasonable to decide that Dr. Reilly's "actual salary

7

entitlement" could be $0 for a quarter, it would be unreasonable to conclude his "actual salary entitlement" could be a negative number, such as a personal debt for $5,000.[2]

The second problem is that even if the court were to read "deficit" as the Clinic urges, there are no words in the contract that signal Dr. Reilly's agreement to be personally liable for the "deficit." As mentioned above, it is clear that the "make up" of the "deficit" was to be part of the reconciliation and accounting process, not as a cash transaction between Dr. Reilly and the Clinic. The parties could have chosen language that would have imposed an obligation on Dr. Reilly to repay the deficit, rather than off set it against future salary. For example, had the contract stated that Dr. Reilly was required to "refund" the "deficit" before receiving further draws, or that Dr. Reilly would be personally liable to "repay" the amount of any draw that exceeded his salary entitlement, the contract may have allowed the interpretation for which the Clinic argues.

The parties, however, did not enter into such a contract and the court is not permitted to rewrite the contract to make a better agreement for one of the parties than the party made for itself. It is clear from the 2001 Employment Agreement that when the parties intended for Dr. Reilly to be personally liable for expenses, they could clearly express such an agreement. For

---

[2]The implausibility of this reading is further emphasized when one remembers that the Clinic could terminate Dr. Reilly for no cause with 100 days' notice. Under the Clinic's reading, there would have been nothing stopping the Clinic from depreciating the cancer center's new equipment over one year (or less), charging that depreciation to Dr. Reilly as a "usage fee," counting this extremely high figure as a "deficit," firing Dr. Reilly, and then suing him for what amounts to the cost of the equipment. While the court recognizes that parties are more or less free to contract for anything, such an absurd result was surely not contemplated by either party.

example, in paragraph 5 of Article II, the parties agreed that Dr. Reilly was required to repay the

Clinic for deductions disallowed for tax purposes:

> " . . . Employee shall refund to the Corporation an amount equal to the disallowed portion of such compensation.  Such disallowed amount shall be paid by Employee to the Corporation within six (6) months after the date on which the Corporation pays the deficiency with respect to such compensation; provided, however, in lieu of payment by Employee to the Corporation, the Board of Directors of the Corporation may, in the discretion of the Board, withhold amounts from Employee's future compensation payments hereunder until the amount owed to the Corporation has been fully recovered.

(2001 Employment Agreement at 2, attached as Ex. P. to Clinic's Memo. in Support.)  Similar

language could have been used to require Dr. Reilly to pay any overdraw deficit had that been the

parties' intent.

Third, under this contract, the Clinic's sole specified recourse against Dr. Reilly if he incurs

a "deficit" is to refuse to pay him any further draws until the "deficit" is "made up."  As discussed

further below, the Clinic asserts that Dr. Reilly "made up" his "deficits" under this contract by

entering into a so-called amortization agreement.  But the only reasonable way to interpret the

amortization arrangement is as the Clinic's decision about how it would apportion Clinic expenses

in calculating Dr. Reilly's salary entitlement.  The Clinic made this decision in a effort to increase

the short term compensation that would be paid to Dr. Reilly in the hope that doing so would retain

him as an employee of the Clinic.  For all of these reasons, the court finds that there is insufficient

evidence from which a jury could conclude that Dr. Reilly agreed to be personally liable for

expenses allocated to his department by entering into the 2001 Employment Agreement.

The Clinic's argument that Dr. Reilly should be obligated for the expenses allocated to his

department because the 2001 Employment Agreement created a partnership also fails.  The 2001

Employment Agreement cannot be reasonably read as a partnership agreement.  Under Utah law,

for a partnership to exist:

> The parties must combine their property, money, effects, skill, labor and knowledge. As a
> general rule, there must be [1] a community of interest in the performance of the common
> purpose, [2] a joint proprietary interest in the subject matter, [3] a mutual right to control,
> [4] a right to share in the profits, and [5] unless there is an agreement to the contrary, a duty
> to share in any losses which may be sustained.

Ellsworth Paulsen Const. Co. v. 51-SPR-L.L.C., 183 P.3d 248, 252 (Utah 2008) (quoting Bassett v.

Baker, 530 P.2d 1, 2 (Utah 1974).  Beyond perhaps the first element, the 2001 Employment

Agreement fails to establish any of these elements and in fact negates several of them.  For

example, the agreement does not entitle Dr. Reilly to a share of profits, but instead indicates that he

is to be compensated at a rate unilaterally as determined by the Clinic's board.  Moreover, the court

could not find a "mutual right to control" in a situation where the Clinic has the right to terminate

Dr. Reilly without cause.[3]  Further, if the parties had believed they were members of a partnership,

upon Dr. Reilly's termination, the partnership would have been dissolved, requiring a division of

the partnerships' assets as well as its liabilities.  It is clear from the facts, that the Clinic did not

dissolve, there was no division of assets, only an attempt to require Dr. Reilly to accept

responsibility for a share of the liabilities.  Moreover, the Clinic continued as a viable, on-going

---

[3]The court does not accept the Clinic's specious argument that by failing to deny certain
paragraphs in the Clinic's fact section characterizing Dr. Reilly as a "partner" or "full partner"
with the Clinic, Dr. Reilly has admitted that he should be treated as a partner for purposes of
paying expenses.  Those paragraphs indeed use the word "partner," but they do not establish the
factual predicates for the court to conclude that a partnership existed between Dr. Reilly and the
Clinic as a matter of law.

operation.  All of these facts are inconsistent with the Clinic's argument that there was a

partnership between it and Dr. Reilly.

### 2.      Physician Compensation Plan

The Clinic further argues that the Clinic's Physician Compensation Plan supports its

position.  The first and most obvious failing of this argument is that this plan was not a contract

between Dr. Reilly and the Clinic.  Moreover, even if the plan did bind Dr. Reilly, the plan does

contain any unambiguous statement that Clinic doctors were to be personally liable for any

expense.  In arguing otherwise, the Clinic first points to the plan's statement that "[r]evenue and

expenses are distributed to individual physicians based on their respective department policy."

(Ex. N. to Clinic's Memo. in Support.)  But placed in context, the only reasonable way to read

these words is as a description of how the Clinic plans to allocate revenue and expenses when

determining compensation for each individual doctor.  Nothing in this sentence would put a

reasonable person on notice that he is expected to pay personally for expenses allocated to his

department and used in the calculation of compensation.

Next, the Clinic points out that Physician Compensation Plan states that the "technical

income from the Cancer Center will be divided 60%/40% with the Oncologists and CUMC,

respectively."  (Id.)  Again, the only reasonable reading of this provision in the context of the plan

is a statement of how the Clinic intends to allocate technical income.  This sentence does not

reasonably suggest that the Clinic was agreeing that doctors would become partners with respect to

the cancer center's equipment or that doctors would be personally liable for the loans or leases

entered by the Clinic to acquire the equipment necessary of the operation of the Clinic.  Indeed, the

language of the 2001 Employment Agreement precludes such a reading.  The Clinic, not Dr.

Reilly, was responsible to provide all of the equipment necessary for Dr. Reilly to practice his area of expertise.  The 2001 Employment Agreement provides:

> Working Facilities and Expenses.  Employee shall be provided with an office, text books and professional journals, stenographic and technical help, one home telephone and such other **facilities, equipment**, supplies and services suitable to Employee's position and adequate for the performance of Employee's duties.

(2001 Employment Agreement at 4, attached as Ex. P. to Clinic's Memo. in Support (emphasis added).)  To require Dr. Reilly to be personally liable for equipment necessary for him to practice would be directly contrary to the Clinic's express obligation to provide him with the necessary "facilities" and "equipmnent."

### 3.      Purchase Option Agreement

The last written document the Clinic cites is the Purchase Option Agreement.  That agreement, made between Dr. Reilly and his colleagues on one hand and the Clinic on the other, related to the Radiation Oncology department's equipment.  The Clinic argues that this document was an agreement by Dr. Reilly to be personally liable for his share of 60% of losses generated by the equipment.  But again this reading is not supported by the language of contract itself.  The paragraph of the agreement the Clinic relies upon states as follows:

> **PROFIT ALLOCATION.**   With respect to the technical component fees and reimbursements received from the use and operation of the Equipment, [the Clinic] hereby represents and warrants to the Shareholders that net profits, after payment of amounts due under the Equipment Leases and other reasonable and necessary costs of operating and maintaining the Equipment, are allocated according to the following formula (a) 40% of net profits to [the Clinic] as a whole to its physicians as a whole [sic] (including the Shareholders) as compensation and (b) 60% of net profits to physicians in the Oncology Department (consisting of both medical oncologists and radiation oncologists) as compensation. [The Clinic] covenants and agrees that it intends that such net profits will continue to be allocated in that manner during the term of the Equipment Leases, subject to applicable laws.

(Ex. Y to Clinic's Memo. in Support.)  This paragraph cannot be reasonably read as Dr. Reilly's agreement to pay personally for the costs of the equipment out of his pocket.  Instead, this paragraph states that the Clinic will pay the equipment-related costs, determine if there is a net profit, and allocate that net profit using the specified split.  There is not even a hint in this paragraph or elsewhere that the parties jointly agreed to pay for equipment expenses.  Again, any other reading would require the court to disregard the Clinic's obligation under the 2001 Employment Agreement to provide Dr. Reilly the equipment.

Moreover, the existence of the Purchase Option Agreement reinforces the point that Dr. Reilly and the Clinic were not partners with respect to the equipment or otherwise.  Under Ellsworth Paulsen, it is clear that partners must have a "joint proprietary interest in the subject matter."  183 P.3d at 252.  Dr. Reilly's interest in the equipment was not proprietary, but rather was limited to an option to continue leases in his name, or to purchase Clinic-owned equipment, in the event that he and his two colleagues left the Clinic.  Further, the Purchase Option Agreement makes clear that it is the Clinic alone which determined what "reasonable and necessary costs" relating to the equipment encompassed, negating the idea that Dr. Reilly had "mutual control" over the equipment.  See id.  Finally, if the shareholders truly believed they were in a partnership with Dr. Reilly, the equipment, equipment leases and other assets of the busness would have had to have been divided between the partners upon Dr. Reilly leaving.  That did not happen.  Indeed, the Clinic continues to hold all of the assets, including the equipment at issue here, as part of its continuing business.

### 4.      The Clinic's Business Model

In addition to these written agreements, the Clinic points to other possible bases to conclude that Dr. Reilly agreed to be personally liable for the debts.  First, the Clinic asserts that Dr. Reilly understood that it was the Clinic's "business model" that doctors would have to go out of pocket for expenses and he agreed to that model by working at the Clinic.  But beyond Dr. Blair's bald assertion that Dr. Reilly understood that he would be personally liable for expenses when Dr. Blair and Dr. Reilly were in initial discussions with the Clinic, the Clinic offers no evidence that this was the case.  As such, the court cannot conclude that Dr. Reilly agreed to personally pay for expenses simply by working at the Clinic.

### 5.      The Amortization Agreement

The Clinic also argues that a so-called amortization agreement shows Dr. Reilly's understanding that he personally owed the Clinic for the expenses.  Specifically, the Clinic asserts that Dr. Reilly agreed to pay the Clinic for expenses allocated to his department over a period of seven years in exchange for being able to take draws on his salary.  This supposed agreement is not supported by the facts here.  Most importantly, as already discussed, the record contains no evidence that Dr. Reilly ever agreed that the expenses at issue would be his personal debts.  That others around Dr. Reilly referred to the expenses as "debts" or "liabilities" and Dr. Reilly did not object does not prove that Dr. Reilly agreed with those individuals.

Rather than an agreement to repay debt, the evidence supports only a finding that the amortization arrangement was an accounting decision by the Clinic as to how compensation would be determined under the 2001 Employment Agreement.  The course of conduct by the Clinic in determining expenses supports this conclusion.  The Clinic unilaterally determined the type and

14

amount of expenses that it attributed to Dr. Reilly with no input by Dr. Reilly.  Accordingly, it was

the Clinic that determined how to allocate the usage fees on the equipment, the Clinic that

determined how much of a loss that Dr. Clark generated, and the Clinic that determined how much

to return to Medicare.  There was no express language in the 2001 Employment Agreement

preventing the Clinic from allocating to Dr. Reilly a higher or lower equipment usage fee, or from

calculating Dr. Clark's expenses differently, or from allocating the Medicare repayment over a

longer or shorter period.  In other words, the size of the nearly $900,000 deficit of Dr. Reilly's

department in December 2004 was not calculated according to any agreement between Dr. Reilly

and the Clinic, but by the Clinic alone.

Ultimately, it is clear that the Clinic's practical need to retain Dr. Reilly as an employee of

the Clinic, rather than any contractual or partnership obligations to Dr. Reilly, drove the Clinic's

decisions about allocating expenses and about the period over which those expenses would be

amortized.  By "amortizing" expenses over seven years, the Clinic simply adjusted downward the

amount of expense it would debit against revenue generated by Dr. Reilly in calculating his salary.

Accordingly, by agreeing to the amortization concept, Dr. Reilly did not agree that he would be

personally liable for the claimed expenses.  Instead, he agreed that the Clinic should lower the

amount of expense it would attribute to him so that he could get paid under the 2001 Employment

Agreement.  The Clinic offers no admissible evidence that the discussions leading to the

amortization arrangement would support a finding that Dr. Reilly had agreed to amend the 2001

Employment Agreement to make him personally liable for expenses.

Moreover, Dr. Reilly's participation in the talks about the amortization agreement was

gratuitous.  The 2001 Employment Agreement did not require Dr. Reilly's approval on the level or

15

type of expenses he was being charged.  Nor is there any admissible evidence that Dr. Reilly had

any decisive input into the terms of the details of the amortization plan.  It is clear that the Clinic

wanted Dr. Reilly to continue working at the Clinic and a readjustment had to be made to the way

it was charging expenses.

For all these reasons, the court believes that summary judgment in Dr. Reilly's favor on the

Clinic's claim for breach of contract against him is required.  The court emphasizes that this

conclusion applies to each type of debt at issue here.  The Clinic asserts that during his deposition

in this case, Dr. Reilly acquiesced to owing the Medicare repayment and Dr. Clark's first year

expenses.  But a review of the record indicates that Dr. Reilly understood himself to be answering

questions on these subjects either hypothetically or with the understanding that he did not agree to

the premise.  Such statements by Dr. Reilly of his understanding at the time of the depositions do

not change the court's legal conclusions that (1) the 2001 Employment Agreement does not allow

the interpretation for which the Clinic argues and (2) there is no other admissible evidence

sufficient to support a finding that Dr. Reilly agreed to amend the contract to become personally

liable for the expenses incurred by the Clinic.

The essence of this dispute is the Clinic's unhappiness with the agreement it made with Dr.

Reilly.  The Clinic elected to do business as a professional corporation with shareholders and

employees.  It did not elect to do business as a partnership or some other form of business entity in

which the members have personal liability for the expenses and losses incurred in the operation.

The Clinic elected in this case to allow Dr. Reilly to draw compensation in excess of the amount

that may have been justified by the amount of revenue being generated.  The Clinic made the

decision to do so in the hope of retaining Dr. Reilly as an employee and the prospect that if it could

retain him in the long run the practice would be financially successful.  When Dr. Reilly

nevertheless decided to leave, the Clinic sought to change the terms of his relationship from that of

a shareholder and employee with limited liability to an arrangement in which Dr. Reilly would

become personally liable for expenses the Clinic sought to allocate to him.  In this effort, the Clinic

has attempted to hold Dr. Reilly personally liable for expenses and the depreciation it has claimed

on equipment the Clinic purchased or leased to maintain the practice.  Regardless of whatever

model the Clinic may have adopted for the purpose of including such depreciation and other

expenses in the formula for calculating the compensation of its physicians, the evidence on this

record is insufficient to allow a jury to find that Dr. Reilly agreed to become personally liable for

such expenses.

      **B.**      **Unjust Enrichment**

      In the Clinic's discussion of its unjust enrichment claim, the Clinic invites the court to

weigh the equities of allowing Dr. Reilly to retain the Medicare funds and Dr. Clark's first year

revenues.  But such an exercise would be pointless.  That is because the Clinic has not produced

any evidence that it made any payments to Dr. Reilly except for those required by the 2001

Employment Agreement.  And under Utah law, an unjust enrichment remedy is unavailable to

recover funds paid pursuant to an express contract.  See TrueGreen Cos., L.L.C. v. Mower

Brothers, Inc., 199 P.3d 929, 933 (Utah 2008) ("As tools of equity, [restitution and unjust

enrichment] are used only when no express contract is present.").  To entertain the Clinic's claim

for unjust enrichment would require the court to act in equity to make a better contract for the

Clinic than the Clinic made for itself.  Doing so would not be an appropriate use of the court's

equity powers in these circumstances.  Accordingly, the Clinic's unjust enrichment claim is not

valid under Utah law.  The court's view of whether it is "fair" for Dr. Reilly to keep the money is irrelevant.

For the reasons discussed above, Dr. Reilly's motion for summary judgment in his favor on the Clinic's claims against him is GRANTED.  The court DENIES the Clinic's motion with respect to the first six points it raises.

## II.     Other Issues Raised in the Cross Motions

### A.     Pension Payments

The Clinic seeks a judgment that Dr. Reilly is not entitled to any pension payments for the fourth quarter of 2005.  Dr. Reilly concedes that this is so.  Accordingly, the Clinic's motion for a judgment on this particular issue is GRANTED.

### B.     Accounts Receivable

The Clinic seeks a judgment that Dr. Reilly is entitled to 80% of his actual accounts receivable that the Clinic collected between December 22, 2005 and December 21, 2008.  Dr. Reilly does not dispute this contention, but apparently denies that Dr. Blair is entitled to 50% of that 80%.  Neither party offers any evidence indisputably showing that Dr. Blair should or should not receive any of these funds.  Accordingly, this issue is not appropriate for summary judgment, and the Clinic's motion is DENIED.

### C.     Dr. Reilly's Bonus and Stock Purchase Price

Dr. Reilly also seeks a judgment that he is entitled to a bonus from the Clinic of about $98,000.  He also claims that the Clinic owes him $24,000, which is how much Dr. Reilly paid for his shares of ownership in the Clinic.  The Clinic does not dispute that it owes Dr. Reilly these amounts, but claims that it is retaining them as set-off against his asserted debts to the Clinic.  See

18

e.g., <u>Mark VII Fin. Consultants Corp. v. Smedley</u>, 792 P.2d 130, 132-33 (Utah Ct. App. 1990) (discussing set-off) and <u>In re Davidson Lumber Sales, Inc.</u>, 66 F.3d 1560, 1564 (10th Cir. 1995) (same, Utah law).

However, as discussed above, the Clinic does not have a valid claim for monetary relief against Dr. Reilly.  Therefore, Dr. Reilly's motion is GRANTED with respect to these two amounts.  Accordingly, the Clinic is ORDERED to pay Dr. Reilly $122,048.25, plus pre-judgment interest.

<b>ORDER</b>

For the reasons stated above, the court ORDERS as follows:

Dr. Reilly's motion for partial summary judgement (Dkt. No. 20) is GRANTED in part and DENIED in part; and

The Clinic's motion for partial summary judgment (Dkt. No. 26) is GRANTED in part and DENIED in part.

SO ORDERED this 26th day of May 2009.

BY THE COURT:

_____

Clark Waddoups
United States District Judge

19